**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

MAGISTRATE JUDGE
VITUNAC

CASE NO.: 03-

**03-81066 CIV-RYSKAMP**

ROSEMARY R. RICHARDS,

       Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, and
FIDELITY NATIONAL FINANCIAL
INC.,

       Defendants.

_____/

FILED
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.-FTL
03 NOV 20 PM 3:44

**COMPLAINT AND JURY DEMAND**

**A.**    **Introduction**

1.    This is an action for disability benefits pursuant ERISA 29 U.S.C. 1001 et. seq. under a disability plan in which plaintiff maintains she was completely disabled under the plan.

**B.**    **The Parties**

2.    The plaintiff was employed by defendant FIDELITY NATIONAL FINANCIAL INC., at all times relevant in the complaint and is a resident within this district and in all other respects is sui juri.

3.    Defendant HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY. is a corporation conducting a significant amount of business in the State of Florida.

4.    Defendant Fidelity  maintained a Group Benefit Plan was the plan administrator and is a corporation conducting a significant amount of business in the State of Florida.

1



## C.    **Jurisdiction**

5.      Defendant Fidelity provides to its employees such as plaintiff a Group Long Term Disability Benefits Plan, ( hereinafter the disability plan) in addition to her salary.  A true copy is attached as Exhibit "A" By the very terms of the plan, Defendant is Fidelity is the plan administrator and thus is responsible for monitoring the implementation of the disability policy, claims process, appeal process and as such is a  fiduciary.

6.      Defendant Hartford  monitored the implementation of the disability policy, claims process, appeal process and as such is also a plan administrator or fiduciary.

7.      The Disability Plan was designed and intended to qualify under the requirements of ERISA and upon information does  in fact qualify as a plan pursuant to 29 U.S.C. 1002 (1) and (3).

8.      This Court has jurisdiction to hear this ERISA claim pursuant to 29 U.S.C. 1132.

9.      At all times  the plaintiff is qualified participant in the disability plan pursuant to 29 U.S.C. 1132.

## D.    **Factual Statement**

10.      The Plaintiff duly applied for long term disability benefits under the plan.

11.      Thereafter, on February 26, 2003, plaintiff was advised that she was *not* qualified for long term disability benefits. (Exhibit "B")

12.      Plaintiff timely appealed said determination on August 2, 2003  regarding the February 26, 2003 determination because plaintiff is totally disabled.  In addition, plaintiff provided updated medical records on or about September 17, 2003.  (Exhibit "C")  Plaintiff is suffering from profoundly disabling degenerative impairments including demyelinating disease demonstrated by a MRI of the brain (probable multiple sclerosis) and clinical correlation, multi level cervical disc disease

2

(HNP) demonstrated by MRI, arthritis, sever depression and antiphospholipid antibody syndrome demonstrated by a lab report. In addition, Ms. Richards had disabling pain, weakness, fatigue, parasthesias, loss of dexterity, cognitive and memory impairments. Plaintiff condition is permanent and deteriorating over time. Plaintiff is in excruciating pain. She cannot sit or stand for any significant period of time and is unable to work, even in a sedentary job.

13.    On or about October 23, 2003, defendants denied plaintiff's appeal. (Exhibit "D")

14.    Plaintiff has furnished defendants with timely notice and proof of claim of her disabling illness and impairments and has otherwise performed all the conditions precedent to entitle her to recover under the disability plan for payment of disability benefits.

15.    At all times hereinafter mentioned, plaintiff should have been qualified and entitled to receive long term disability benefits pursuant to the disability plan.

16.    The continued denial of plaintiff's rights under the guise that she is not disabled deprives her of disability benefits and is arbitrary, illegal, capricious, unreasonable and contrary to 29 U.S.C. 1001 et. seq. The decision to classify her as not disabled is not supported by substantial evidence.

17.    The Plaintiff has exhausted all administrative remedies available to her under the policy.

18.    The Defendants' denial of the Plaintiff's claim for benefits was a breach of the insurance contract.

19.    The Defendants' denial of the Plaintiff's claim was arbitrary, in that in practice it was actually based on the unfettered individual discretion of the Defendant's various claims representatives rather then on the Plan, the guidelines for processing claims, or the Defendant's policy. The Defendants

failed to limit or restrain the exercise of such individual discretion of its employees as required by the Plan and the guidelines for processing claims which the Defendant purportedly followed.

20.     The Defendant's' denial of the Plaintiff's claim was capricious in that it was impulsive and unpredictable and based on the whims of the Defendants' claims representatives.

21.     As a direct and proximate result the actions, plaintiff has incurred attorneys' fees in an amount not yet known to plaintiff.

22.     As a direct and proximate result of the actions, plaintiff has sustained damages in an amount not now known to plaintiff but on information and belief, such damages will approximate the amount of the benefits due plaintiff in accordance with the disability plan.

## FIRST CLAIM FOR RELIEF

25.     The continued denial of plaintiff's rights under the guise that she is not disabled deprives her of disability benefits and is arbitrary, illegal, capricious, unreasonable and contrary to 29 U.S.C. 1001 et. seq.   The decision to classify her as  not disabled is not supported by substantial evidence.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for a judgment in her favor and against defendants as follows:

a.     Declaring plaintiff disabled according to the disability plan;

b.     Declaring that all rights and benefits due plaintiff is vested and non-forfeit able or in the alternative to award plaintiff a money judgment for sums due and owing which  approximate the amount of the benefits due plaintiff in accordance with the disability plan;

d.     That defendant pay plaintiff's costs of this suit, together with a  reasonable attorney's fee pursuant to 29 U.S.C. 1132 (g) (1);

4

e. Any other relief that is just and equitable;

**PLAINTIFF HEREIN DEMANDS A JURY TRIAL.**

Dated: Fort Lauderdale, Florida
   November 19, 2003

STEWART LEE KARLIN, P.A.
Attorney for Plaintiff
The Advocate Building-Second Floor
315 S.E. 7th Street
Fort Lauderdale, Florida 33301
(954) 462-1201
edlawkarlin@aol.com
Florida Bar No. 096115

*E X H I B I T "A"*

# GROUP
# BENEFIT
# PLAN

## FIDELITY NATIONAL FINANCIAL, INC.

## TABLE OF CONTENTS

**Group Long Term Disability Benefits**

PAGE

CERTIFICATE OF INSURANCE ..................................................................................................... 3
SCHEDULE OF INSURANCE ........................................................................................................ 4
    Must you contribute toward the cost of coverage? ....................................................................... 4
    Who is eligible for coverage? ..................................................................................................... 4
    When will You become eligible? (Eligibility Waiting Period) ....................................................... 4
ELIGIBILITY AND ENROLLMENT ............................................................................................. 5
    When does your coverage start? ................................................................................................. 6
    When will coverage become effective if a disabling condition causes you to be absent from work on the date it
    is to start? ................................................................................................................................. 6
    Can you change benefit options? ................................................................................................ 7
    When will a requested change in benefit options take effect? ....................................................... 7
BENEFITS ..................................................................................................................................... 7
    When do benefits become payable? ............................................................................................ 7
    When will benefit payments terminate? ...................................................................................... 8
    What happens if you return to work but become Disabled again? ................................................. 8
CALCULATION OF MONTHLY BENEFIT ................................................................................... 9
    Family Care Credit Benefit ....................................................................................................... 10
PRE-EXISTING CONDITIONS LIMITATIONS ............................................................................ 10
    Are there any other limitations on coverage? ............................................................................ 10
EXCLUSIONS .............................................................................................................................. 11
    What Disabilities are not covered? ............................................................................................ 11
TERMINATION ........................................................................................................................... 12
    When does your coverage terminate? ........................................................................................ 12
    Does your coverage continue if your employment terminates because you are Disabled? ............... 12
GENERAL PROVISIONS .............................................................................................................. 13
DEFINITIONS .............................................................................................................................. 14
STATUTORY PROVISIONS ......................................................................................................... 18
ERISA .......................................................................................................................................... 24

PS-M-90

INSURER INFORMATION NOTICE

**NOTICE REQUIREMENT**

**IF YOU HAVE A COMPLAINT, AND CONTACTS BETWEEN YOU AND THE INSURER OR AN AGENT OR OTHER REPRESENTATIVE OF THE INSURER HAVE FAILED TO PRODUCE A SATISFACTORY SOLUTION TO THE PROBLEM, THEN YOU MAY CONTACT:**

STATE OF CALIFORNIA INSURANCE DEPARTMENT
CONSUMER SERVICES UNIT
300 SOUTH SPRING STREET
LOS ANGELES, CA 90013

1-800-927-HELP

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**
Hartford, Connecticut
(Herein called Hartford Life)

**CERTIFICATE OF INSURANCE**
Under
**The Group Insurance Policy**
**as of the Effective Date**
Issued by
**HARTFORD LIFE**
to
**The Policyholder**

This is to certify that Hartford Life has issued and delivered the Group Insurance Policy to The Policyholder.

The Group Insurance Policy insures the employee of the Policyholder who is named below and who:
- is eligible for the insurance;
- becomes insured; and
- continues to be insured;
according to the terms of the Policy.

EMPLOYEE NAME:_____
SOCIAL SECURITY NUMBER:_____

The terms of the Group Insurance Policy which affect an employee's insurance are contained in the following pages. This Certificate of Insurance and the following pages will become your Booklet-certificate. The Booklet-certificate is a part of the Group Insurance Policy.

This Booklet-certificate replaces any other which Hartford Life may have issued to the Policyholder to give to you under the Group Insurance Policy specified herein.

**Christine Hayer Repasy,** *Secretary*                    **Thomas M. Marra,** *President*

Z-LTD(C001)

## SCHEDULE OF INSURANCE

Final interpretation of all provisions and coverages will be governed by the Group Insurance Policy on file with Hartford Life at its home office.

| | |
|---|---|
| Policyholder: | FIDELITY NATIONAL FINANCIAL, INC. |
| Group Insurance Policy: | GLT-673816 |
| Plan Effective Date: | January 1, 2001 |

This plan of Disability Insurance provides you with loss of income protection if you become disabled from a covered accidental bodily injury, sickness or pregnancy.

**Must you contribute toward the cost of coverage?**
You must contribute toward the cost of coverage.

**Who is eligible for coverage?**

| | |
|---|---|
| Eligible Class(es): | All Active Full-time Employees of Fidelity National Financial, Inc. who are U.S. citizens or U.S. residents excluding temporary, leased seasonal and contract employees. |
| Full-time Employees: | 30 scheduled hours weekly |
| **Maximum Monthly Benefit:** | $15,000 |
| **Minimum Monthly Benefit:** | $50 |
| **Benefit Percentage:** | 60% |
| **Annual Enrollment Period:** | A period of time as determined by your Employer |

**When will You become eligible? (Eligibility Waiting Period)**
If You are working for the Employer prior to the Plan Effective Date and were covered under the Prior Plan, You are eligible for coverage on the later of the Plan Effective Date or the first day of the month following the date You enter an eligible class.

If You start working for the Employer after the Plan Effective Date, You are eligible for coverage on the first day of the month following the date on which You complete a waiting period of 90 days of continuous service.

If you are rehired within 90 days of leaving Fidelity National Financial Inc., you will not be subject to a new eligibility waiting period and coverage becomes effective on the first of the month following your rehire date.

The Elimination Period is the period of time you must be Disabled before benefits become payable. It is the last to be satisfied of the following:
1. the first 180 consecutive day(s) of any one period of Disability; or
2. with the exception of benefits required by state law, the expiration of any Employer sponsored short term disability benefits or salary continuation program.

MAXIMUM DURATION OF BENEFITS TABLE

| Age When Disabled | Benefits Payable |
|---|---|
| Prior to Age 63 | To Normal Retirement Age or 42 months, if greater |
| Age 63 | 36 months |
| Age 64 | 30 months |
| Age 65 | 24 months |
| Age 66 | 21 months |
| Age 67 | 18 months |
| Age 68 | 15 months |
| Age 69 and over | 12 months |

Normal Retirement Age means the Social Security Normal Retirement Age as stated in the 1983 revision of the United States Social Security Act. It is determined by your date of birth as follows:

| Year of Birth | Normal Retirement Age |
|---|---|
| 1937 or before | 65 |
| 1938 | 65 + 2 months |
| 1939 | 65 + 4 months |
| 1940 | 65 + 6 months |
| 1941 | 65 + 8 months |
| 1942 | 65 + 10 months |
| 1943 thru 1954 | 66 |
| 1955 | 66 + 2 months |
| 1956 | 66 + 4 months |
| 1957 | 66 + 6 months |
| 1958 | 66 + 8 months |
| 1959 | 66 + 10 months |
| 1960 or after | 67 |

The above table shows the maximum duration for which benefits may be paid. All other limitations of the plan will apply.

## ELIGIBILITY AND ENROLLMENT

**Who are Eligible Persons?**
All persons in the class or classes shown in the Schedule of Insurance will be considered Eligible Persons.

**When will you become eligible?**
You will become eligible for coverage on either:
1.   the Plan Effective Date, if you have completed the Eligibility Waiting Period; or if not
2.   the date on which you complete the Eligibility Waiting Period as defined in the Schedule of Insurance.

**How do you enroll?**
To enroll you must:
1.   complete and sign a group insurance enrollment form which is satisfactory to us; and
2.   deliver it to the Employer.

If you do not enroll within 31 days after becoming eligible, the following limitations will apply to a later enrollment:
1.   you must submit Evidence of Insurability satisfactory to us; and
2.   you may not enroll until:
    a)   an Annual Enrollment Period; or
    b)   you have a Change in Family Status.

Any such enrollment must be made during the Annual Enrollment Period or within 31 days of the Change in Family Status.

The dates of the Annual Enrollment Period are shown in the Schedule of Insurance.

**What constitutes a Change in Family Status?**
A Change in Family Status means:
1.   your marriage, or the birth or adoption of a child, or becoming the legal guardian of a child;
2.   the death of or divorce from your spouse; or
3.   the death of or emancipation of a child.

**What is Evidence of Insurability?**
If you are required to submit Evidence of Insurability, you must:
1.   complete and sign a health and medical history form provided by us;
2.   submit to a medical examination, if requested;
3.   provide any additional information and attending physicians' statements that we may require; and
4.   furnish all such evidence at your own expense.

We will then determine if you are insurable under the plan.

## WHEN COVERAGE STARTS

**When does your coverage start?**
If you must contribute towards the plan's cost, your coverage will start on the date determined below:
1.   the date you become eligible, if you enroll or have enrolled by then;
2.   the date on which you enroll, if you do so within 31 days after the date you are eligible;
3.   on the first day of the month following the date we approve your Evidence of Insurability, if you are required to submit Evidence of Insurability; or
4.   the first day of January following the Annual Enrollment Period if you enroll during an Annual Enrollment Period.

## DEFERRED EFFECTIVE DATE

**When will coverage become effective if a disabling condition causes you to be absent from work on the date it is to start?**
If you are absent from work due to:
1.   accidental bodily injury;
2.   sickness;
3.   pregnancy;
4.   Mental Illness; or
5.   Substance Abuse,

on the date your insurance or increase in coverage would otherwise have become effective, your effective date will be deferred.  Your insurance, or increase in coverage will not become effective until the first day of the month following the date you are Actively at Work for one full day.

## CHANGES IN COVERAGE

**Can you change benefit options?**
You may change to an option providing increased or decreased benefits only:
1.  during an Annual Enrollment Period; or
2.  within 31 days of a Change in Family Status.

You may decrease coverage, or increase coverage to a higher option.  An increase in coverage will be subject to your submission of Evidence of Insurability that meets our approval.

**When will a requested change in benefit options take effect?**
If you enroll for a change in benefit option during an Annual Enrollment Period, the change will take effect on the later of:
1.  the first day of January following the Annual Enrollment Period; or
2.  on the first day of the month following the date we approve your Evidence of Insurability if you are required to submit Evidence of Insurability.

If you enroll for a change in benefit option within 31 days following a Change in Family Status, the change will take effect on the first day of the month following date we approve your Evidence of Insurability if you are required to submit Evidence of Insurability.

Any such increase in coverage is subject to the following limitations:
1.  the Deferred Effective Date Provision; and
2.  Pre-existing Conditions Limitations.

**Do coverage amounts change if there is a change in your class or your rate of pay?**
Your coverage may increase or decrease on the date there is a change in your class or Monthly Rate of Basic Earnings. However, no increase in coverage will be effective unless on that date you:
1.  are an Active Full-time Employee; and
2.  are not absent from work due to being Disabled.

If you were so absent from work, the effective date of such increase will be deferred until the first day of the month following the date you are Actively at Work for one full day.

No change in your Rate of Basic Earnings will become effective until the date we receive notice of the change.

**What happens if the Employer changes the plan?**
Any increase or decrease in coverage because of a change in the Schedule of Insurance will become effective on the date of the change, subject to the following limitations on an increase:
1.  the Deferred Effective Date provision; and
2.  Pre-existing Conditions Limitations.

## BENEFITS

**When do benefits become payable?**
You will be paid a monthly benefit if:
1.  you become Disabled while insured under this plan;
2.  you are Disabled throughout the Elimination Period;
3.  you remain Disabled beyond the Elimination Period;
4.  you are, and have been during the Elimination Period, under the Regular Care of a Physician; and
5.  you submit Proof of Loss satisfactory to us.

Benefits accrue as of the first day after the Elimination Period and are paid monthly.

**When will benefit payments terminate?**

We will terminate benefit payment on the first to occur of:

1.  the date you are no longer Disabled as defined;
2.  the date you fail to furnish Proof of Loss, when requested by us;
3.  the date you are no longer under the Regular Care of a Physician, or refuse our request that you submit to an examination by a Physician;
4.  the date you die;
5.  the date your Current Monthly Earnings exceed:
    a)  80% of your Indexed Pre-disability Earnings if you are receiving benefits for being Disabled from Your Occupation;
    b)  an amount that is equal to the product of your Indexed Pre-disability Earnings and the Benefit Percentage if you are receiving benefits for being Disabled from Any Occupation;
6.  the date determined from the Maximum Duration of Benefits Table shown in the Schedule of Insurance;
7.  the date no further benefits are payable under any provision in this plan that limits benefit duration; or
8.  the date you refuse to receive recommended treatment that is generally acknowledged by physicians to cure, correct or limit the disabling condition.

## MENTAL ILLNESS AND SUBSTANCE ABUSE BENEFITS

**Are benefits limited for Mental Illness or Substance Abuse?**

If you are Disabled because of:

1.  Mental Illness that results from any cause;
2.  any condition that may result from Mental Illness;
3.  alcoholism; or
4.  the non-medical use of narcotics, sedatives, stimulants, hallucinogens, or any other such substance,

then, subject to all other Policy provisions, benefits will be payable:

1.  only for so long as you are confined in a hospital or other place licensed to provide medical care for the disabling condition; or
2.  when you are not so confined, a total of 24 months for all such Disabilities during your lifetime.

## RECURRENT DISABILITY

**What happens if you return to work but become Disabled again?**

Attempts to return to work as an Active Full-time Employee during the Elimination Period will not interrupt the Elimination Period, provided no more than 30 such return-days are taken.

Any day you were Actively at Work will not count towards the Elimination Period.

After the Elimination Period, when a return to work as an Active Full-time Employee is followed by a recurrent Disability, and such Disability is:

1.  due to the same cause; or
2.  due to a related cause; and
3.  within 6 month(s) of the return to work,

the Period of Disability prior to your return to work and the recurrent Disability will be considered one Period of Disability, provided the Group Insurance Policy remains in force.

If you return to work as an Active Full-time Employee for 6 month(s) or more, any recurrence of a Disability will be treated as a new Disability. A new Disability is subject to a new Elimination Period and a new Maximum Duration of Benefits. The Elimination Period and Maximum Duration of Benefits Table are in the Schedule of Insurance.

The term "Period of Disability" as used in this provision means a continuous length of time during which you are Disabled under this plan.

## CALCULATION OF MONTHLY BENEFIT

**How are Disability benefits calculated?**

**Return to Work Incentive**
If you remain Disabled after the Elimination Period, but work while you are Disabled, we will determine your Monthly Benefit for a period of up to 12 consecutive months as follows:
1.   multiply your Pre-Disability Earnings by the Benefit Percentage;
2.   compare the result with the Maximum Benefit; and
3.   from the lesser amount, deduct Other Income Benefits.

Current Monthly Earnings will not be used to reduce your Monthly Benefit. However, if the sum of your Monthly Benefit and your Current Monthly Earnings exceeds 100% of your Pre-disability Earnings, we will reduce your Monthly Benefit by the amount of excess.

The 12 consecutive month period will start on the last to occur of:
1.   the day you first start such work; or
2.   the end of the Elimination Period.

If you are Disabled and not receiving benefits under the Return to Work Incentive, we will calculate your Monthly Benefit as follows:
1.   multiply your Monthly Income Loss by the Benefit Percentage;
2.   compare the result with the Maximum Benefit; and
3.   from the lesser amount, deduct Other Income Benefits.

The result is your Monthly Benefit.

**What happens if the sum of the Monthly Benefit, Current Monthly Earnings and Other Income Benefits exceeds 100% of Pre-disability Earnings?**
We will reduce your Monthly Benefit by the amount of the excess. The reduction will be applied to all employees receiving disability benefits regardless of participating in the return to work incentive program.

**Minimum Monthly Benefit**
Your Monthly Benefit will not be less than the Minimum Monthly Benefit shown in the Schedule of Insurance.

**How is the benefit calculated for a period of less than a month?**
If a Monthly Benefit is payable for less than a month, we will pay 1/30 of the Monthly Benefit for each day you were Disabled.

Benefit Percentages and Maximum Benefits are shown in the Schedule of Insurance.

## REHABILITATIVE PROGRAM

**What Vocational rehabilitative services are available?**
Vocational rehabilitation (Rehabilitative program) means *employment or services that prepare you,* if Disabled, *to resume gainful work.* If you are Disabled, our vocational rehabilitative services may help prepare you to resume gainful work.

Our vocational rehabilitative services include, when appropriate, any necessary and feasible:
1.   vocational testing;
2.   vocational training;
3.   work-place modification, to the extent not otherwise provided;
4.   prosthesis; or
5.   job placement.

## FAMILY CARE CREDIT BENEFIT

**What if you must incur expenses for Family Care Services in order to participate in a Rehabilitative program?**
If you are working as part of a program of Rehabilitative Employment, we will, for the purpose of calculating your benefit, deduct the cost of Family Care from earnings received from a Rehabilitative program, subject to the following limitations:

1. Family Care means the care or supervision of:
   a) your children under age 13; or
   b) a member of your household who is mentally or physically handicapped and dependent upon you for support and maintenance;
2. the maximum monthly deduction allowed for each qualifying child or family member is:
   a) $350 during the first 12 months of Rehabilitative Employment; and
   b) $175 thereafter,
   c) but in no event may the deduction exceed the amount of your monthly earnings;
3. Family Care Credits may not exceed a total of $2,500 during a calendar year;
4. the deduction will be reduced proportionally for periods of less than a month;
5. the charges for Family Care must be documented by a receipt from the caregiver;
6. the credit will cease on the first to occur of the following:
   a) you are no longer in a Rehabilitative program; or
   b) Family Care Credits for 24 months have been deducted during your Disability; and
7. no Family Care provided by an immediate relative of the family member receiving the care will be eligible as a deduction under this provision. An immediate relative is a spouse, sibling, parent, step-parent, grandparent, aunt, uncle, niece, nephew, son, daughter or grandchild.

Your Current Monthly Earnings after the deduction of your Family Care Credit will be used to determine your Monthly Income Loss. In no event will you be eligible to receive a Monthly Benefit under the plan if your Current Monthly Earnings before the deduction of the Family Care Credit exceed 80% of your Indexed Pre-disability Earnings.

## PRE-EXISTING CONDITIONS LIMITATIONS

**Are there any other limitations on coverage?**
No benefit will be payable under the plan for any Disability that is due to, contributed to by, or results from a Pre-existing Condition, unless such Disability begins:

1. after the last day of 90 consecutive day(s) while insured during which you receive no medical care for the Pre-existing Condition; or
2. after the last day of 365 consecutive day(s) during which you have been continuously insured under this plan.

**Pre-existing Condition** means:

1. any accidental bodily injury, sickness, Mental Illness, pregnancy, or episode of Substance Abuse; or
2. any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, Mental Illness, pregnancy, or Substance Abuse;

for which you received Medical Care during the 90 day period that ends the day before:

1. your effective date of coverage; or
2. the effective date of a Change in Coverage.

**Medical Care** is received when:

1. a Physician is consulted or medical advice is given; or
2. treatment is recommended, prescribed by, or received from a Physician.

Treatment includes but is not limited to:

1. medical examinations, tests, attendance or observation; and
2. use of drugs, medicines, medical services, supplies or equipment.

## CONTINUITY FROM A PRIOR PLAN

**Is there continuity of coverage from a Prior Plan?**
If you were:
1. insured under the Prior Plan;
2. Actively at Work; and
3. not eligible to receive benefits under the Prior Plan,

on the day before the Plan Effective Date, the Deferred Effective Date provision will not apply to you.

If you become insured under the Group Insurance Policy on the Plan Effective Date and were covered under the Prior Plan on the day before the Plan Effective Date, the Pre-existing Conditions Limitation will cease to apply on the first to occur of the following dates:
1. the Plan Effective Date, if your coverage for the Disability was not limited by a pre-existing condition restriction under the Prior Plan; or
2. if your coverage was limited by a pre-existing condition restriction under the Prior Plan, the date the restriction would have ceased to apply had the Prior Plan remained in force.

The amount of the Monthly Benefit payable for a Pre-existing Condition in accordance with the previous paragraph will be the lesser of:
1. the Monthly Benefit which was paid by the Prior Plan; or
2. the Monthly Benefit provided by this plan.

No payment shall be made after the earlier to occur of:
1. the date payments would have ceased under the Prior Plan; or
2. the date payments cease under this plan.

If you received Monthly Benefits for Disability under the Prior Plan, and:
1. you returned to work as an Active Full-time Employee before the Effective Date of this plan;
2. within 6 months of the return to work, you have a recurrence of the same Disability under this plan; and
3. there are no benefits available for the recurrence under the Prior Plan,

the Elimination Period of this plan, which would otherwise apply to the recurrence, will be waived if the recurrence would have been covered without any further Elimination Period under the Prior Plan had it remained in force.

## EXCLUSIONS

**What Disabilities are not covered?**
The plan does not cover, and no benefit shall be paid for any Disability:
1. unless you are under the Regular Care of a Physician;
2. that is caused or contributed to by war or act of war (declared or not);
3. caused by your commission of or attempt to commit a felony, or to which a contributing cause was your being engaged in an illegal occupation; or
4. caused or contributed to by an intentionally self-inflicted injury.

If you are receiving or are eligible for benefits for a Disability under a prior disability plan that:
1. was sponsored by the Employer; and
2. was terminated before the Effective Date of this plan,

no benefits will be payable for the Disability under this plan.

## TERMINATION

**When does your coverage terminate?**
You will cease to be covered on the earliest to occur of the following dates:
1.  the date the Group Insurance Policy terminates;
2.  the date the Group Insurance Policy no longer insures your class;
3.  the date premium payment is due but not paid by the Employer;
4.  the last day of the period for which you make any required premium contribution, if you fail to make any further required contribution;
5.  the last day of the month immediately following the date your Employer terminates your employment;
6.  the date you cease to be an Active Full-time Employee in an eligible class including:
    a)  temporary layoff;
    b)  leave of absence; or
    c)  a general work stoppage (including a strike or lockout)
    all coverages terminate on the last day of the month in which the employee terminates or is no longer eligible; or
7.  the date your Employer ceases to be a Participant Employer, if applicable.

**Does your coverage continue if your employment terminates because you are Disabled?**
If you are Disabled and you cease to be an Active Full-time Employee, your insurance will be continued:
1.  during the Elimination Period while you remain Disabled by the same Disability; and
2.  after the Elimination Period for as long as you are entitled to benefits under the Policy.

**Must premiums be paid during a Disability?**
No premium will be due for you:
1.  after the Elimination Period; and
2.  for as long as benefits are payable.

**Do benefits continue if the plan terminates?**
If you are entitled to benefits while Disabled and the Group Insurance Policy terminates, benefits:
1.  will continue as long as you remain Disabled by the same Disability; but
2.  will not be provided beyond the date we would have ceased to pay benefits had the insurance remained in force.

Termination for any reason of the Group Insurance Policy will have no effect on our liability under this provision.

**May coverage be continued during an authorized leave of absence?**
If you are granted an authorized leave of absence by your Employer including absence in accordance with the  Family and Medical Leave Act of 1993, your Employer may continue your insurance for up to 12 weeks, or longer if required by state law, following the date your coverage would have terminated, subject to the following:
1.  the leave authorization must be in writing;
2.  the required premium for you must be paid;
3.  your benefit level, or the amount of earnings upon which your benefit may be based, will be that in effect on the day before said leave commenced; and
4.  such continuation will cease at the end of the month if one of the following events should occur:
    a)  the leave terminates prior to the agreed upon date;
    b)  the termination of the Group Insurance Policy;
    c)  non-payment of premium when due by the Policyholder or you;
    d)  the Group Insurance Policy no longer insures your class; or
    e)  your Employer ceases to be a Participant Employer, if applicable.

## GENERAL PROVISIONS

**What happens if facts are misstated?**
If material facts about you were not stated accurately:
1.  your premium may be adjusted; and
2.  the true facts will be used to determine if, and for what amount, coverage should have been in force.

No statement made by you relating to your insurability will be used to contest the insurance for which the statement was made after the insurance has been in force for two years during you lifetime. In order to be used, the statement must be in writing and signed by you

**When should we be notified of a claim?**
You must give us written notice of a claim within 30 days after Disability starts. If notice cannot be given within that time, it must be given as soon as possible. Such notices include your name, your address and the Group Insurance Policy number.

**Are special forms required to file a claim?**
When we receive a notice of claim, you will be sent forms for providing us with proof of loss. We will send these forms within 15 days after receiving a notice of claim. If we do not send the forms within 15 days, you may submit any other written proof which fully describes the nature and extent of your claim.

**When must proof of Disability be given?**
Written proof of loss must be sent to us within 90 days after the start of the period for which we owe payment. After that, we may require further written proof that you are still Disabled.
If proof is not given by the time it is due, it will not affect the claim if:
1.  it was not possible to give proof within the required time; and
2.  proof is given as soon as possible; but
3.  no later than 1 year after it is due, unless you are not legally competent.

We have the right to require, as part of the proof of loss:
1.  your signed statement identifying Other Income Benefits; and
2.  proof satisfactory to us that you and your dependants have duly applied for all Other Income Benefits which are available.

After submitting proof of loss, you will be required to apply for Social Security disability benefits. If the Social Security Administration denies your eligibility for any such benefits, you will be required to follow the process established by the Social Security Administration to reconsider the denial and, if denied again, to request a hearing before an Administrative Law Judge of the Office of Hearing and Appeals.

We reserve the right to determine if your proof of loss is satisfactory. You will not be required to claim any retirement benefits if doing so will cause your retirement benefits to be reduced.

**What additional proof of Disability are we entitled to?**
We may have you examined to determine if you are Disabled. Any such examination will be:
1.  at our expense; and
2.  as reasonable required by us.

**Who gets the benefit payments?**
All payments are payable to you. Any payments owed at your death may be paid to your estate. If any payment is owed to your estate, a person who is a minor or a person who is not legally competent, then we may pay up to $1,000 to any of your relatives who is entitled to it in our opinion. Any such payment shall fulfill our responsibility for the amount paid.

**When are payment checks issued?**
If written proof of loss is furnished, accrued benefits will be paid at the end of each month that you are Disabled. If payment for a part of a month is due at the end of a claim, it will be paid as soon as written proof of loss is received.

**What notification will you receive if your claim is denied?**
If a claim for benefits is wholly or partly denied, you will be furnished with written notification of the decision. This written decision will:
1.  give the specific reason(s) for the denial;
2.  make specific reference to the Policy provisions on which the denial is based;
3.  provide a description of any additional information necessary to prepare a claim and an explanation of why it is necessary; and
4.  provide an explanation of the review procedure.

**What recourse do you have if your claim is denied?**
On any denied claim, you or your representative may appeal to us for a full and fair review. You may:
1.  request a review upon written application within 60 days of the claim denial;
2.  review pertinent documents; and
3.  submit issues and documents in writing.

A decision will be made by us no more than 60 days after the receipt of the request, except in special circumstances (such as a need to hold a hearing), but in no case more than 120 days after the request for review is received. The written decision will include specific references to the Policy provisions on which the decision is based.

**When can legal action be started?**
Legal action cannot be taken against us:
1.  sooner than 60 days after due Proof of Loss has been furnished; or
2.  three years after the time written Proof of Loss is required according to the terms of the Policy (five years in Kansas; six years in South Carolina).

**What are our subrogation rights?\***

\* Note: not applicable to residents of Minnesota, Missouri, New Jersey and North Carolina

If an Insured Person:
1.  suffers a Disability because of the act or omission of a third party;
2.  becomes entitled to and is paid benefits under the Group Insurance Policy in compensation for lost wages; and
3.  does not initiate legal action for the recovery of such benefits from the third party in a reasonable period of time;

then we will be subrogated to any rights the Insured Person may have against the third party and may, at its option, bring legal action to recover any payments made by it in connection with the Disability.

**Who interprets policy terms and conditions?**
We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

## DEFINITIONS

The terms listed will have these meanings.

**Actively at Work**
You will be considered to be actively at work with your Employer on a day which is one of your Employer's scheduled work days if you are performing, in the usual way, all of the regular duties of your job on a Full-time basis on that day. You will be deemed to be actively at work on a day which is not one of your Employer's scheduled work days only if you were actively at work on the preceding scheduled work day.

**Active Full-time Employee** means an employee who works for the Employer on a regular basis in the usual course of the Employer's business. The employee must work the number of hours in the Employer's normal work week. This must be at least the number of hours indicated in the Schedule of Insurance.

**Any Occupation** means an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance.

**Commissions** mean the monthly average of commissions paid to you by the Employer over the 24 calendar month period ending just prior to the date you become Disabled, or over the number of calendar months of employment if less than this period.

**Current Monthly Earnings** means the monthly earnings you receive from:
1. the Employer while Disabled;
2. other employment.

**Disability or Disabled** means that during the Elimination Period and for the next 24 months you are prevented by:
1. accidental bodily injury;
2. sickness;
3. Mental Illness;
4. Substance Abuse; or
5. pregnancy,

from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.

After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation does not alone mean that you are Disabled.

**Employer** means the Policyholder.

**Essential Duty** means a duty that:
1. is substantial, not incidental;
2. is fundamental or inherent to the occupation; and
3. can not be reasonably omitted or changed.

To be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty.

**Indexed Pre-disability Earnings** when used in this policy means your Pre-disability Earnings adjusted annually by adding the lesser of:
1. 10%; or
2. the percentage change in the Consumer Price Index (CPI-W).

The adjustment is made January 1st each year after you have been Disabled for 12 consecutive months, and if you are receiving benefits at the time the adjustment is made.

The term Consumer Price Index (CPI-W) means the index for Urban Wage Earners and Clerical Workers published by the United States Department of Labor. It measures on a periodic (usually monthly) basis the change in the cost of typical urban wage earners' and clerical workers' purchase of certain goods and services. If the index is discontinued or changed, we may use another nationally published index that is comparable to the CPI-W.

For the purposes of this benefit, the percentage change in the CPI-W means the difference between the current year's CPI-W as of July 31st, and the prior year's CPI-W as of July 31st, divided by the prior year's CPI-W.

**Mental Illness** means any psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations of psychological, behavioral or emotional disorders, but excluding demonstrable, structural brain damage.

**Monthly Benefit** means a monthly sum payable to you while you are Disabled, subject to the terms of the Group Insurance Policy.

**Monthly Income Loss** is the difference of your Pre-disability Earnings less your Current Monthly Earnings.

**Monthly Rate of Basic Earnings** means your regular monthly rate of pay, including Commissions, from the Employer just prior to the date you become Disabled:
1. including contributions you make through a salary reduction agreement with the Employer to:
   a) an Internal Revenue Code (IRC) Section 401(k), 403(b) or 457 deferred compensation arrangement;
   b) an executive non qualified deferred compensation arrangement; or
   c) a salary reduction arrangement under an IRC Section 125 plan; and
2. not including bonuses, overtime pay or expense reimbursements for the same period as above.

**Other Income Benefits** mean the amount of any benefit for loss of income, provided to you or to your family, as a result of the period of Disability for which you are claiming benefits under this plan. This includes any such benefits for which you or your family are eligible or that are paid to you, or to a third party on your behalf, pursuant to any:
1. temporary or permanent disability benefits under a Workers' Compensation Law, occupational disease law, or similar law, governmental law or program that provides disability or
2. unemployment benefits as a result of your job with the Employer;
3. plan or arrangement of coverage, whether insured or not, or as a result of employment by or association with the Employer or as a result of membership in or association with any group, association, union or other organization;
4. individual insurance policy where the premium is wholly or partially paid by the Employer;
5. "no-fault" automobile insurance plan;* or

* **Note:** not applicable to residents of Pennsylvania

6. disability benefits under the United States Social Security Act, the Railroad Retirement Act, the Canada Pension Plan, the Quebec Pension Plan, or similar plan or act that, your spouse and children are eligible to receive because of your Disability.

Other Income Benefits also mean any payments that are made to you, your family, or to a third party on your behalf, pursuant to any:
1. disability benefit under the Employer's Retirement Plan;
2. portion of a settlement or judgment, minus associated costs, of a lawsuit that represents or compensates for your loss of earnings;
3. retirement benefit from a Retirement Plan that is wholly or partially funded by employer contributions, unless:
   a) you were receiving it prior to becoming Disabled; or
   b) you immediately transfer the payment to another plan qualified by the United States Internal Revenue Service for the funding of a future retirement.

   Other Income Benefits will not include the portion, if any, of such retirement benefit that was funded by your after-tax contributions; or
4. retirement benefits under the United States Social Security Act, the Railroad Retirement Act, the Canada Pension Plan, the Quebec Pension Plan, or similar plan or act that you, your spouse and dependent children receive because of your retirement, unless you were receiving them prior to becoming Disabled.

If you are paid Other Income Benefits in a lump sum or settlement, you must provide proof satisfactory to us of:
1. the amount attributed to loss of income; and
2. the period of time covered by the lump sum or settlement.

We will pro-rate the lump sum or settlement over this period of time. If you cannot or do not provide this information, we will assume the entire sum to be for loss of income, and the time period to be 24 months. We may make a retroactive allocation of any retroactive Other Income Benefit. A retroactive allocation may result in an overpayment of your claim.

The amount of any increase in Other Income Benefits will not be included as Other Income Benefits if such increase:
1.  takes effect after the date benefits become payable under this plan; and
2.  is a general increase which applies to all persons who are entitled to such benefits.

**Physician** means a person who is:
1.  a doctor of medicine, osteopathy, psychology or other healing art recognized by us;
2.  licensed to practice in the state or jurisdiction where care is being given; and
3.  practicing within the scope of that license.

**Pre-disability Earnings** means your Monthly Rate of Basic Earnings in effect on the day before you became Disabled.

**Prior Plan** means the long term disability insurance carried by the Employer on the day before the Plan Effective Date.

**Regular Care of a Physician** means you are attended by a Physician, who is not related to you:
1.  with medical training and clinical experience suitable to treat your disabling condition; and
2.  whose treatment is:
    a)  consistent with the diagnosis of the disabling condition;
    b)  according to guidelines established by medical, research and rehabilitative organizations; and
    c)  administered as often as needed,

    to achieve the maximum medical improvement.

**Retirement Plan** means a defined benefit or defined contribution plan that provides benefits for your retirement and which is not funded wholly by your contributions.  It does not include:
1.  a profit sharing plan;
2.  thrift, savings or stock ownership plans;
3.  a non-qualified deferred compensation plan; or
4.  an individual retirement account (IRA), a tax sheltered annuity (TSA), Keogh Plan, 401(k) plan or 403(b) plan.

**Substance Abuse** means the pattern of pathological use of alcohol or other psychoactive drugs and substances characterized by:
1.  impairments in social and/or occupational functioning;
2.  debilitating physical condition;
3.  inability to abstain from or reduce consumption of the substance; or
4.  the need for daily substance use to maintain adequate functioning.

Substance includes alcohol and drugs but excludes tobacco and caffeine.

**We, us** or **our** means the Hartford Life and Accident Insurance Company.

**You, your, Insured Person** means the Insured Person to whom this Booklet-certificate is issued.

**Your Occupation**, if used in this Booklet-certificate, means your occupation as it is recognized in the general workplace.  Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location.

## STATUTORY PROVISIONS

### ARKANSAS

The following provisions is applicable to residents of **Arkansas** and is included to bring your Booklet-certificate into conformity with **Arkansas** state law.

Insurer Information Notice

Any questions regarding the plan may be directed to The Hartford Insurance Group Sales Office indicated below:

Hartford Life Insurance Company
Atlanta Group Sales
4550 Northpoint Parkway
Alpharetta, GA 30022-2409

1-800-888-560-9632

If the question is not resolved, you may contact the Arkansas Insurance Department:

Arkansas Insurance Department
Consumer Services Division
1200 West third Street
Little Rock, Arkansas 72201-1904

Telephone: 1-800-852-5494

This notice is for information only and does not become a condition of the plan.

### MASSACHUSETTS

The following provision is applicable to residents of **Massachusetts** and is included to bring your Booklet-certificate into conformity with **Massachusetts** state law.

**Continuation**

The following is added to the Termination section of your booklet.

**Does your coverage continue if your employment terminates or you cease to be a member of an eligible class?**
If your insurance terminates because your employment terminates or you cease to be a member of an eligible class, your insurance will automatically be continued until the end of a 31 day period from the date your insurance terminates or the date you become eligible for similar benefits under another group plan, whichever occurs first.

If your insurance terminates because your employment is terminated as a result of a plant closing or covered partial closing, your insurance may be continued. You must elect in writing to continue insurance and pay the required premium for continued coverage. Coverage will cease on the earliest to occur of the following dates:
1. 90 days from the date you were no longer eligible for coverage as an Active Full-time Employee;
2. the date you become eligible for similar benefits under another group plan;
3. the last day of the period for which required premium is made;
4. the date the Group Insurance Policy terminates;
5. the date your Employer ceases to be a Participant Employer, if applicable.

Continued coverage is subject to all other applicable terms and conditions of the policy.

## MINNESOTA

The following provisions are applicable to residents of **Minnesota** and are included to bring your Booklet-certificate into conformity with **Minnesota** state law.

### 1. Limitations

The following provisions replace the provisions of the same title appearing in the Pre-existing Conditions Limitations section of your Booklet-certificate.

**Are there any other limitations on coverage?**
No benefit will be payable under the plan for any Disability that is due to, contributed to by, or results from a Pre-Existing Condition, unless:
1. such Disability begins after the last day of 90 consecutive day(s) while insured during which you received no Medical Care for the Pre-existing Condition; or
2. loss is incurred for the Disability after the last day of 365 consecutive day(s) during which you have been continuously insured under this plan.

**Pre-existing Condition** means any accidental bodily injury, sickness, Mental Illness, pregnancy, or episode of Substance Abuse, for which you received Medical Care during the 90 day period that ends the day before:
1. your effective date of coverage; or
2. the effective date of a Change in Coverage.

### 2. Proof of Loss

The following provision replaces the provision of the same title appearing in the General Provisions section of your Booklet-certificate.

**When must Proof of Loss be given?**
Written Proof of Loss must be sent to us within 90days after the start of the period for which we owe payment. If proof is not given by the time it is due, it will not affect the claim if:
1. it was not possible to give proof within the required time; and
2. proof is given as soon as possible.

We may request Proof of Loss throughout your Disability. In such cases, we must receive the proof within 30 days of the request.

### 3. Replacement of Prior Group Long Term Disability Insurance

The Deferred Effective Date provision will not apply to you on the Policy Effective Date if you were covered under the prior plan and Actively at Work on the day before the Policy Effective Date.

## NEW HAMPSHIRE

The following provision is applicable to residents of **New Hampshire** and is included to bring your Booklet-certificate into conformity with **New Hampshire** state law.

If you have a question regarding a claim, you or the policyholder may call Hartford Life at 1-800-752-9713. When calling, please give us the following information:
1. the policy number; and
2. the name of the policyholder (employer or organization) as shown in this Booklet-certificate.

This notice is for your information only and does not become a condition of this Booklet-certificate.

NEW YORK

The following provisions are applicable to residents of **New York** and are included to bring your Booklet-certificate into conformity with **New York** state law.

**1. Pre-existing Conditions Limitations**

The following provision is added to the paragraph entitled "Are there any other limitations on coverage?" in the Pre-existing Conditions Limitations section appearing in your booklet.

However, if you become insured under the Group Insurance Policy and were covered under a group or blanket disability insurance plan or employer-provided disability benefit arrangement within 60 days of your effective date of coverage under this plan, any:
1. treatment-free period requirements; or
2. period of coverage requirements,

which were satisfied or partially satisfied under your previous coverage will be credited toward satisfaction of similar periods under this plan.

**2. Continuity From a Prior Plan**

The section entitled "Continuity From a Prior Plan" is amended to read as follows:

**Is there continuity of coverage from a Prior Plan?**
If you were:
1. insured under the Prior Plan;
2. Actively at Work; and
3. not eligible to receive benefits under the Prior Plan,

on the day before the Plan Effective Date, the Deferred Effective Date provision will not apply to you.

If you were covered under a Prior Plan within 60 days prior to the date your coverage under this plan takes effect, the Pre-Existing Conditions Limitation will cease to apply on the first to occur of the following dates:
1. the date your coverage under the plan takes effect, if your coverage for the Disability was not limited by a pre-existing condition restriction under the Prior Plan; or
2. if your coverage was limited by a pre-existing condition restriction under the Prior Plan, the date the restriction would have ceased to apply had the Prior Plan remained in force.

The amount of the Monthly Benefit payable for a Pre-existing Condition in accordance with the previous paragraph will be the lesser of:
1. the Monthly Benefit which was paid by the Prior Plan; or
2. the Monthly Benefit provided by this plan.

No payment shall be made after the earlier to occur of:
1. the date payments would have ceased under the Prior Plan; or
2. the date payments cease under this plan.


**Prior Plan**, for the purpose of this provision, means an employer-provided disability benefit arrangement or group or blanket long term disability insurance carried by the Employer on the day before the Plan Effective Date.

## NORTH CAROLINA

The following provisions are applicable to residents of **North Carolina** and are included to bring your Booklet-certificate into conformity with **North Carolina** state law.

### 1. Other Income Benefits Definition

With respect to the definition of Other Income Benefits which appears in the Definitions section of your Booklet-certificate, the following two items do not apply to you.

The item in the first paragraph of the definition of Other Income Benefits which reads we will offset with a "no-fault" automobile insurance plan does not apply to you.

The item in the second paragraph of the definition of Other Income Benefits which reads we will offset with a "portion of a settlement or judgement, minus associated costs, of a lawsuit that represents or compensates for your loss of earnings" does not apply to you.

### 2. Regular Care and Attendance by a Physician

The following paragraph is added to the provision entitled "When do benefits become payable" appearing in the Disability Benefits section of your Booklet-certificate.

Regular care by a physician will cease to be required, if in the opinion of qualified medical professionals, further medical care and treatment would be of no benefit to you.

### 3. Notification

The following provision replaces the provision of the same title appearing in the General Provisions section of your Booklet-certificate.

**When should we be notified of a claim?**
You must give us written notice of a claim within 30 days after Disability starts. If notice cannot be given within that time, it must be given as soon as possible. Such notice must include your name, your address and the Group Insurance Policy number. The notice should be sent to the Hartford Life and Accident Insurance Company, Hartford Plaza, Hartford, Connecticut 06115, or to the Employer, or an authorized agent of Hartford Life.

## OKLAHOMA

The following provision is applicable to residents of **Oklahoma** and is included to bring your Booklet-certificate into conformity with **Oklahoma** state law.

### Fraud Warning

WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of insurance fraud.

# TEXAS

The following provisions are applicable to residents of Texas and are included to bring your Booklet-certificate into conformity with Texas state law.

## 1. Workers' Compensation Notice

THE INSURANCE POLICY UNDER WHICH THIS CERTIFICATE IS ISSUED IS NOT A POLICY OF WORKERS' COMPENSATION INSURANCE. YOU SHOULD CONSULT YOUR EMPLOYER TO DETERMINE WHETHER YOUR EMPLOYER IS A SUBSCRIBER TO THE WORKERS' COMPENSATION SYSTEM.

## 2. Insurer Information Notice

**IMPORTANT NOTICE**

**To obtain information or make a Complaint:**

You may call Hartford Life's toll-free telephone number for information or to make a complaint at:

**1-800-752-9713 if about a claim**
**1-800-428-5711 if not about a claim**

You may also write to
Hartford Life
P.O. Box 2999
Hartford, CT  06104-2999

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

**1-800-252-3439**

You may write the
Texas Department of Insurance
P.O. Box 149104
Austin, TX  78714-9104
FAX # (512)475-1771

**PREMIUM OR CLAIM DISPUTES:**
Should you have a dispute concerning your premium or about a claim you should contact Hartford Life first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for information only and does not become a part or condition of the attached document

**AVISO IMPORTANTE**

**Para Obtener Informacion O Para Someter Una Queja:**

Usted puede llamar al numero de telefono gratis de Hartford's para informacion o para de someter una queja al:

**1-800-752-9713 ascerca de un reclamo**
**1-800-428-5711 para una queja**

Usted tambien puede escribir a
Hartford
P.O. Box 2999
Hartford, CT  06104-2999

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias coberturas, derechos o quejas al:

**1-800-252-3439**

Puede escribir al
Departamento de Seguros de Texas
P.O. Box 149104
Austin, TX  78714-9104
FAX # (512)475-1771

**DISPUTAS SOBRE PRIMAS O RECLAMOS:**
Si tiene una disputa concerniente a su prima o a un reclamo debe comunicarse con el (la compania) Hartford primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU POLIZA:**
Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

## VERMONT

The following provision is applicable to residents of **Vermont** and is included to bring your Booklet-certificate into conformity with **Vermont** state law.

**Where To Call With Claim Questions**

If you have a question about a claim, you may call Hartford Life at the following toll-free telephone number: 1-800-531-5855.

When calling, please provide the following information:
1. The policy number; and
2. The name of the policyholder (employer or organization), as shown in this Booklet-certificate's Schedule of Insurance.

## WISCONSIN

The following provision is applicable to residents of **Wisconsin** and is included to bring your Booklet-certificate into conformity with **Wisconsin** state law.

**Subrogation**

The following provision replaces the provision of the same title appearing in the General Provisions section of your Booklet-certificate.

**What are our subrogation rights?**
If an Insured Person:
1. suffers a Disability because of the act or omission of a third party;
2. becomes entitled to and is paid benefits under the Group Insurance Policy in compensation for lost wages; and
3. does not initiate legal action for the recovery of such benefits from the third party in a reasonable period of time,

then we will be subrogated to any rights the Insured Person may have against the third party and may, at its option, bring legal action to recover any payments made by it in connection with the Disability.  Such right may be exercised only if the Insured Person has been, or will be, fully compensated for the lost wages.

ERISA

**The Following Important Notice
is Provided by Your Employer
for your Information Only.**

**Conforming Instrument**

For the purpose of meeting certain requirements of the Employee Retirement Income Security Act of 1974, the following information and the attached Claim Procedures and Statement of ERISA Rights are provided for use with your booklet-certificate to form the Summary Plan Description.

The benefits described in your booklet are provided under a group plan by the Insurance Company and are subject to the terms and conditions of that plan.

A copy of this plan is available for your review during normal working hours in the office of the Plan Administrator.

1.  **Plan Name**

    Group Long Term Disability Plan for employees of FIDELITY NATIONAL FINANCIAL, INC.

2.  **Plan Number**

    501

3.  **Employer/Plan Sponsor**

    FIDELITY NATIONAL FINANCIAL, INC.
    17911 Von Karman Avenue Suite 520
    Irvine, CA 93110

4.  **Employer Identification Number**

    86-0417131

5.  **Type of Plan**

    Welfare Benefit Plan providing Group Long Term Disability.

6.  **Plan Administrator**

    FIDELITY NATIONAL FINANCIAL, INC.
    17911 Von Karman Avenue Suite 520
    Irvine, CA 93110

7.  Agent for Service of Legal Process

For the Plan:

FIDELITY NATIONAL FINANCIAL, INC.
17911 Von Karman Avenue Suite 520
Irvine, CA  93110

For the Policy:

Hartford Life And Accident Insurance Company
200 Hopmeadow St.
Simsbury, CT 06089

In addition to the above, Service of Legal Process may be made on a plan trustee or the plan administrator.

8.  **Sources of Contributions** -- The Employer pays the premium for the insurance, but may allocate part of the cost to the employee.  The Employer determines the portion of the cost to be paid by the employee.

9.  **Type of Administration** – The plan is administered by the Plan Administrator with benefits provided in accordance with the provisions of the applicable group plan.

10.  The Plan and its records are kept on a Policy Year basis.

11.  **Labor Organizations**

None

12.  **Names and Addresses of Trustees**

None

13.  **Plan Amendment Procedure**

The Plan Administrator reserves full authority, at its sole discretion, to terminate, suspend, withdraw, reduce, amend or modify the Plan, in whole or in part, at any time, without prior notice.

The Employer also reserves the right to adjust your share of the cost to continue coverage by the same procedures.

**Statement of ERISA Rights**

You are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

1. Receive Information About Your Plan and Benefits:

    a) Examine, without charge, at the plan administrator's office and at other specified locations, such as worksites and union halls, all documents governing the plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.
    b) Obtain, upon written request to the plan administrator, copies of documents governing the operation of the plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The administrator may make a reasonable charge for the copies.
    c) Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

2. Prudent Actions by Plan Fiduciaries:

    In addition to creating rights for plan participants ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

3. Enforce Your Rights:

    If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

    Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

4. Assistance with Your Questions:

    If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.

**Claim Procedures for Disability Income Insurance Plans**

1.  Claims for Benefits:

    If you would like to present a claim for benefits for yourself or your insured dependents, you should obtain a claim form(s) from your Employer or Plan Administrator.  The applicable section of such form(s) should be completed by (1) you, (2) the Employer or Administrator and (3) the Attending Physician or hospital.

    Following completion, the claim form(s) must be forwarded to the individual authorized to evaluate claims (Administrator or Insurance Company's Claim Representative). The individual authorized to evaluate claims will determine if benefits are payable and, if due, issue payment(s) to you.

    The Insurance Company will make a decision no more than 45 days after receipt of your claim.  The time for decision may be extended for two additional 30 day periods provided that, prior to any extension period, the Insurance Company notifies you in writing that an extension is necessary due to matters beyond the control of the plan, identifies those matters and gives the date by which it expects to render its decision.  If your claim is extended due to your failure to submit information necessary to decide your claim, the time for decision shall be tolled from the date on which the notification of the extension is sent to you until the date we receive your response to our request.

    The written decision will include:   1) specific reasons for the decision, 2) specific references to the plan provisions on which the decision is based, 3) a description of any additional material or information necessary for you to perfect the claim and an explanation of why such material or information is necessary, 4) a description of the review procedures and time limits applicable to such procedures, 5) a statement that you have the right to bring a civil action under section 502(a) of ERISA after you appeal our decision and after you receive a written denial on appeal, and, 6)(A) if an internal rule, guideline, protocol, or other similar criterion was relied upon in making the denial, either (i) the specific rule, guideline, protocol or other similar criterion, or (ii) a statement that such a rule, guideline, protocol or other similar criterion was relied upon in making the denial and that a copy will be provided free of charge to you upon request, or (B) if denial is based on medical judgment, either (i) an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to your medical circumstances, or (ii) a statement that such explanation will be provided to you free of charge upon request.

2.  Appealing Denial of Claims:

    On any wholly or partially denied claim, you or your representative may appeal to us for a full and fair review. You may:
    1.   request a review upon written application within 180 days of the claim denial;
    2.   request, free of charge, copies of all documents, records, and other information relevant to your claim; and
    3.   submit written comments, documents, records and other information relating to your claim.

    The Insurance Company will make a decision no more than 45 days after we receive your appeal.  The time for decision may be extended for one additional 45 day period provided that, prior to the extension, the Insurance Company notifies you in writing that an extension is necessary due to special circumstances, identifies those circumstances and gives the date by which it expects to render its decision. If your claim is extended due to your failure to submit information necessary to decide your claim on appeal, the time for decision shall be tolled from the date on which the notification of the extension is sent to you until the date we receive your response to the request. The written decision will include specific references to the plan provisions on which the decision is based and any other notice(s), statement(s) or information required by applicable law.

*E X H I B I T* "*B*"

**The Plan Described in this Booklet**

**is Insured by the**

**Hartford Life and Accident Insurance Company**
Hartford, Connecticut

**Member of The Hartford Insurance Group**





**Hartford Life**

February 26, 2003

Rosemarie R. Richards
1143 N.E. Crown Terr
Jensen Beach, FL  34957

Policy Holder:      Fidelity National Financial, Inc.
Claimant:           Rosemarie R. Richards
SSN:                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
Policy Number:      GLT673816

Dear Ms. Richards:

We are writing to you about your claim for Long Term Disability (LTD) benefits.  These benefits
are under the group insurance policy number GLT673816 for Fidelity National Financial, Inc.

We have completed our review of your claim for benefits and have determined that we must deny
your claim.

Your policy states disabled means that during the elimination period and for the next 24 months you
are prevented by accidental bodily injury, sickness, mental illness, substance abuse or pregnancy
from performing one or more of the essential duties of your occupation, and as a result your current
monthly earnings are no more than 80% of your indexed pre-disability earnings. After that, you
must be so prevented from performing one or more of the essential duties of any occupation.

We based our decision to deny your claim on policy language.  All the papers contained in your file
were viewed as a whole.  This included:

- Report from Dr. Paul Elliott dated 8/9/02 listing impairments of standing 2 hours with 15
  minute break, walking 2 hours with 15 minute break, sitting is o.k., lifting/pushing/pulling no
  more than 10 pounds, driving if vision is o.k. and no repetitive motion.
- Office visit notes from Dr. Elliott dated 9/11/02 impairments same as 8/9/02.
- Notes from Dr. Patricia Brown dated 11/14/02 Irritable, anxious, chronic pain syndrome.
- Dr. Paul Elliott, Neurology, PCE dated 11/14/02 Suffers from blurred vision. No repetitive
  motion, has chronic pain, depression and intermittent confusion. Unknown when patient can
  RTW. Progress notes dated 9/11/02 assessment possible MS, anxiety, fibromyalgia.
- Dr. Howard Hutt, Imaging, 10/22/02. Magnetic resonance imaging of the lumbar spine with and
  without contrast. Clinical diagnosis lower back pain. Conclusion mild degenerative changes
  at L4-5 with a left far lateral L4-5 intraforaminal disc herniation. There are no enhancing

Benefits Integration, a joint venture of
Hartford Life and Specialty Risk
Services, Inc.
P.O. Box 515016
Sacramento, CA 95851-50016
Fax (916) 294-1850

masses.
- Dr. Elliott, progress notes 10/28/02 L4-5 HNP, Possibly MS ? and small vessel disease.
- Report from Dr. Gilda Broadwell PH.D. Claimant seen from 11/25/02 through the present on a weekly basis. Claimant is functioning and coping and able to participate in activities of daily living even though she has chronic pain.
- Office visit notes from Dr. Elliott dated 12/2/02. Sit 2 hours at a time, stand 2 hours at a time, walk 2 hours at a time. Can constantly lift up to 10 pounds. Frequently can lift up to 20 pounds, balance, and reach at waist and below waist. Occasionally can lift up to 50 pounds, climb, stoop, kneel and crouch. Chronic pain. Depression and intermittent confusion. Attending Physician Statement dated 12/30/02 MS questionable. Blurred vision. No change from previous statement.
- Dr. Elliott, progress notes 12/2/02 L4-5 HNP, Fibromyalgia ? and fatigue ?
- Dr. Elliott, APS dated 12/30/02 Diagnosis MS. Secondary diagnosis Cerv. HNP, cerv. Radiculopathy, HTN and fibromyalgia. No repetitive motion. Has bouts of blurred vision and eye pain. Limitations are indefinite. Condition progressive.
- Gilda Broadwell, Psychologist, APS dated 2/19/03 states self reported symptoms of hopelessness and suicidal ideation without plan. She was hyperverab, circumstantial, mood depressed and affect flat. Is able to perform ADLS. Progress notes 2/12/03 Client appears to be making progress, accepting her limitation and learning to cope with pain. Client will continue to attend chronic pain group.
- Gilda Broadwell 2/26/03 TCT from Dr. Broadwell PH.D to The Hartfords Certified Case Manager she stated that the claimant is not suicidal and when asked if she felt the claimant could RTW part time she stated that her present level of depression would not limit her from working.
- Denial of Social Security. "Condition is not severe enough to keep you from working. We considered the medical record and other information, your age, education, training and work experience in determining how your condition affects your ability to work. Review of the medical files show that claimant is being treated for her conditions. Able to act in your own interest and remember and follow instructions. Recognize that she is not capable of heavy work, however is capable of performing work such as you have performed in the past as a title examiner.
- Claimant's 17 page self typed appeal to the social security board. Extremely articulate and detailed. Discussed daily living. Prepares own meals. Uses microwave and water. Does some household chores, laundry, bed making and dishes. Has help with housekeeping. Socializes. Bible study, investment stock club, classic boat club.

The job description and key responsibilities of the Title Examiner position are to proofread and ensure accuracy of all word processing work including but not limited to correct book and page information. Review of all title orders over your authorized level with an underwriter. Assist customers, agents and employees with various title problems and/or concerns as they arise in a courteous and friendly manner. Search, examine and review all title work to ensure compliance with customers instructions applicable state, company guidelines and/or the transactions structure and intent. Prepare policies and endorsements for direct non-escrow orders. Review of new files within 24 hours of receiving to ascertain if any information is needed from customer in order to examine the property. Call customer as soon as possible if order cannot be completed by the time it is needed, cost will exceed our normal charge or any other serious issues. Search and examine

complex titles, often without help of prior title evidence, in such a manner that claims are minimized.

Based on these job responsibilities, medical restrictions and limitations received from the attending physicians and the contents of the file in general, claimant is able to return to her regular occupation.

The Employee Retirement Income Security Act of 1974 (ERISA) gives you the right to appeal our decision and receive a full and fair review. You may appeal our decision even if you do not have new information to send us. You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. If you do not agree with our denial, in whole or in part, and you wish to appeal our decision, you or your authorized representative must write to us within one hundred eighty (180) days from your receipt of this letter. Your appeal letter should be signed, dated and clearly state your position. Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim.

Once we receive your appeal, we will again review your entire claim, including any information previously submitted and any additional information received with your appeal. Upon completion of this review, we will advise you of our determination. After your appeal, and if we again deny your claim, you then have the right to bring a civil action under Section 502(a) of ERISA.

Please send your appeal letter to:

Disability Claim Appeal Unit
Benefit Management Services - Floor B2-E
P.O. Box 2999
Hartford, CT 06104-2999

If you have any questions, please feel free to contact our office at (877) 372-2927, x41857. Our office hours are 8:00 AM to 4:00 PM PST, Monday through Friday.

Sincerely,

Richard F. Burton, Examiner
Hartford Life and Accident Insurance Co.

CC:    Deborah Pichla

*E X H I B I T "C"*

STEVEN M. STEPPER
ATTORNEY AT LAW

2247 PALM BEACH LAKES BOULEVARD
SUITE 226
WEST PALM BEACH, FL 33409

MEMBER OF THE BAR
FLORIDA & NEW YORK

TEL: (561) 615-0098
FAX: (561) 615-0155

August 2, 2003

Hartford Life
Disability Appeal Claim Unit
Benefit Management Services-Floor B2-E
P.O. Box 2999
Hartford, CT 06104-2999

Re:   Claimant: Rosemarie R. Richards
      Soc. Sec. No.: 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
      Policy No.: GLT673816

Dear Sirs:

Please be advised that the undersigned has been retained as the attorney for Ms. Rosemarie Richards in connection to the issues surrounding her above referenced disability policy. Please direct your reply to this correspondence to my offices.

My client has provided me with a copy of the letter dated 2/26/03 from Richard F. Burton of your company. On behalf of Ms. Richards, you are hereby advised that my client categorically disagrees with the determination she is "not disabled" reached therein and, furthermore, this letter is to serve as her formal appeal of said determination.

My ability to respond to Mr. Burton's letter is somewhat hampered by the fact that his letter does not contain an <u>analysis</u> of the facts of this matter. Rather, his letter very briefly summarizes some of the medical and documentary evidence in your file, and then simply sets forth a job description for "title examiner" (presumably largely gleaned from the Department of Labor's Dictionary of Occupational Titles). After reciting the foregoing, Mr. Burton's letter then simply states

"Based on these job responsibilities, medical restrictions and limitations received from the attending physicians, and **the contents of the file in general,** claimant is able to return to her regular occupation" (emphasis added).

Of the course, the foregoing **represents** merely a legal <u>conclusion</u>. There is not a detailed analysis of the facts and

Hartford Life
Disability Claim Appeal Unit
August 2, 2003
Page 2

evidence, or discussion of how given facts and evidence apply to the policy definitions and applicable law. For example, when Mr. Burton cites "...the contents of the file in general..." as a basis for the conclusion reached, the reader can have no specific understanding of what "contents" i.e., what documents or information, he is referring to, let alone how much weight was accorded these sources. This type of summary treatment has long been held in the Federal Courts to be patently improper, as they frustrate the court's plenary review of the merits of these cases (not to mention an appellant's wish to address the facts of the given matter). For this reason alone, your determination herein would not stand up to judicial scrutiny.

Now, while I know not what analysis was relied upon by Mr. Burton, as again none was properly articulated, I have reviewed the medical evidence in my file quite carefully. While I am not a physician myself, I am an attorney who has worked in the field of disability law for nearly 17 years. I have seen my share, and more than my share, of medical files and test results. And I must tell you now that I have rarely seen such extensive documentation of multiple severe illnesses and impairments as I have seen in Ms. Richards file. In fact, there is indisputable objective medical evidence to support all of the medical findings, as well as all of Ms. Richard's subjective complaints. There is extensive clinical and laboratory proofs of profoundly disabling impairments. These include demyelinating disease demonstrated by MRI of the brain and clinical correlation; multi-level cervical disc disease (HNP) demonstrated by MRI; arthritis; severe depression; and antiphospholipid antibody syndrome (demonstrated by lab report). Despite this powerful accumulation of objective evidence, you have somehow seen fit to discount, if not outright reject, Ms. Richard's subjective complaints. As you know, Federal case law provides that the claimant's subject complaints are entitled to "controlling weight" provided that there is a proper objective medical basis for same. As this is the case herein, Ms. Richards' complaints of disabling pain, weakness, fatigue, parasthesias, loss of dexterity, cognitive and memory impairments, inability to deal with ordinary stresses, etc. should have been adjudged "fully credible", and given controlling weight. This treatment of the evidence, the only one consistent with Federal Law, would have necessitated a finding of "disabled" in this case.

I must respectfully point out to you that the references that Mr. Burton makes to the minimal household activities Ms. Richards is capable of hardly supports the determination he reached. There is no requirement that Ms. Richards condition(s) be so horrendous that all she might do is sit vegetating in a dark

Hartford Life
Disability Claim Appeal Unit
August 2, 2003
Page 3

room. She is a person who has to manage as best as she can for herself and her husband, who himself is ill. That means, yes, she may do a necessary errand. That means, yes, she might "use the microwave". She has never suggested otherwise. But to suggest that these facts some how add up to evidence supporting a determination that she can work at her demanding previous occupation, 40 hours per week, 50 weeks per year, at the necessary level of physical and cognitive functioning, simply does not follow.

In conclusion, I am writing in an effort to reach an early resolution of this controversy. It seems clear to me that the reasons cited in Mr. Burton's letter are less than compelling. The unfortunate truth is that Ms. Richards is a permanently totally disabled individual, whose myriad conditions are degenerative in nature. Sadly, her conditions will not improve, but rather worsen over time. Ms. Richards personal physician, Dr. Elliott, has once again certified this fact via a letter to me dated 6/16/03 (copy enclosed along with his most recent Progress Note). Surely, this treating physician is inherently most familiar with Ms. Richards, and his opinions entitled to the highest deference. Federal law categorically requires this. I call upon you to acknowledge this now, and put this matter to rest before costly litigation ensues.

Finally, I remind you that Florida law provides that my client "shall" be awarded attorneys' fees if she receives a "favorable" judgment or verdict, i.e, essentially **any** recovery on her claim against an insurance company. Florida law recognizes a "lodestar" formula, whereby the court has the discretion to multiply the actual fee by a factor to be determined. This multiplier is frequently employed by the Court in this type of case. It is sad that Ms. Richards should now be put at risk by a determination that can only be deemed arbitrary and capricious. I hope you will rectify this sad situation at once. However, in the event you refuse to reverse your determination, and litigation becomes necessary, I will seek a lodestar award for all costs and attorneys' fees incurred as a result.

I will await your timely reply.

Very truly yours,

Steven M. Stepper

SMS/ad

cc: Ms. Rosemarie Richards

```
           TRANSMISSION VERIFICATION REPORT

                                        TIME : 08/03/2003 13:23
                                        NAME : STEVEN M STEFFER ESQ
                                        FAX  : 5616150155
                                        TEL  : 5616150098


        DATE,TIME              08/03 13:21
        FAX NO./NAME           19608436918
        DURATION               00:02:04
        PAGE(S)                03
        RESULT                 OK
        MODE                   STANDARD
                               ECM
```

complex titles, often without help of prior title evidence, in such a manner that claims are minimized.

Based on these job responsibilities, medical restrictions and limitations received from the attending physicians and the contents of the file in general, claimant is able to return to her regular occupation.

The Employee Retirement Income Security Act of 1974 (ERISA) gives you the right to appeal our decision and receive a full and fair review. You may appeal our decision even if you do not have new information to send us. You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. If you do not agree with our denial, in whole or in part, and you wish to appeal our decision, you or your authorized representative must write to us within one hundred eighty (180) days from your receipt of this letter. Your appeal letter should be signed, dated and clearly state your position. Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim.

Once we receive your appeal, we will again review your entire claim, including any information previously submitted and any additional information received with your appeal. Upon completion of this review, we will advise you of our determination. After your appeal, and if we again deny your claim, you then have the right to bring a civil action under Section 502(a) of ERISA.

Please send your appeal letter to:

Disability Claim Appeal Unit
Benefit Management Services - Floor B2-E
P.O. Box 2999
Hartford, CT 06104-2999

*[handwritten: I want to fax these lovely people]*

If you have any questions, please feel free to contact our office at (877) 372-2927, x41857. Our office hours are 8:00 AM to 4:00 PM PST, Monday through Friday.

Sincerely,

*Richard Burton signature*

Richard F. Burton, Examiner
Hartford Life and Accident Insurance Co.

CC:   Deborah Pichla

*[handwritten: If you call Sacramento, they should be able to give you a fax # or at least a phone #]*

**STEVEN M. STEPPER**
ATTORNEY AT LAW

2247 PALM BEACH LAKES BOULEVARD
SUITE 226
WEST PALM BEACH, FL 33409

MEMBER OF THE BAR
FLORIDA & NEW YORK

TEL: (561) 615-0098
FAX: (561) 615-0155

Sept. 17, 2003

The Hartford
Attn: Dave Cohen
P.O. Box 2999
Hartford, CT 06104-2999

Re:   Claimant: Rosemarie R. Richards
      Soc. Sec. No.: 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
      Policy No.: GLT673816

Dear Mr. Cohen:

As you know, I am the attorney for Ms. Rosemarie Richards in connection to the issues surrounding her above referenced disability policy. I am in receipt of your letter dated 9/11/03. As per your request, enclosed are the following:

1.   Records from Richard Kadingo, M.D. for period 5/6/02 through current;

2.   Complete set of Savannas Hospital records for inpatient hospitalization of 5/2/03-5/8/03.

I also provide the following:

3.   Updated office notes dated 8/12/03 and 9/2/03 from Palm Beach Pain Consultants (Dr. Untracht).

4.   Monterrey Medical note dated 9/16/03 for emergent treatment for reactive airway disease.

Please let me know if you require anything further. If I do not hear from you in the near future, I will assume that you have all the records you require for a prompt and thorough review of this matter. The Hartford's actions to date have caused much hardship and distress to the Richards', and for the reasons outlined in my letter of 8/2/03, there is and has been no legal basis for denying this claim. I strongly urge you to take a critical eye the Hartford's earlier actions, and to promptly take steps to rectify the wrong committed.

The Hartford
Attn: Dave Cohen
Sept. 17, 2003
Page 2


  Thank you for your kind attention to this matter.

        Very truly yours,

        Steven M. Stepper

SMS/ad
Encl.

cc: Ms. Rosemarie Richards

*E X H I B I T "D"*



October 23, 2003

Attorney Steven Stepper
2247 Palm Beach Lakes Boulevard, Suite 226
West Palm Beach, FL 33409

Policy Holder:     Fidelity National Financial Inc.
**Insured:**       **Rosemarie Richards**
SS#:               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
Policy Number:     GLT673816

Dear Attorney Stepper:

We have completed the Appeal review of the denial of Rosemarie Richards' Long Term
Disability (LTD) claim. For the reasons noted below, it is our determination that the
denial of her claim must be upheld.

According to the Fidelity National Financial Inc. policy:

> Disability or Disabled means that during the Elimination Period and for the next 24
> months you are prevented by:
>
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. Pregnancy,
>
> From performing one or more of the Essential Duties of Your Occupation, and as a
> result your Current Monthly Earnings are no more than 80% of your Indexed Pre-
> disability Earnings.
>
> After that, you must be so prevented from performing one or more of the Essential
> Duties of Any Occupation.

200 Hopmeadow Street
Simsbury, CT 06089
Telephone 860 525 8555

Mailing Address: P.O. Box 2999
Hartford, CT 06104-2999

We will cease benefit payment on the first to occur of:
1. the date you are no longer disabled;...

Ms. Richards was working in a sedentary exertion-level occupation as a Title Examiner when she left work on 7/12/02.

Please refer to our letter dated 2/26/03 for the basis upon which her LTD claim was denied. Subsequent to our 2/26/03 letter we received the following additional information:

Your letter of appeal on behalf of Ms. Richards dated 8/2/03, received 8/3/03, including:
- Dr. Paul Elliott – disability letter dated 6/16/03
- Dr. Elliott – medical treatment notes dated 6/2/03
Your additional letter on behalf of Ms. Richards dated 9/17/03 including:
- Dr. Richard Kadingo – opthalmology records from 5/16/02 to 7/23/03
- Savannas Hospital – Hospitalization records from 5/2/03 to 5/8/03
Dr. Brian Mercer – Medical record review dated 10/8/03

Ms. Richards left work due to neck and back arthritis, herniated disc and possible multiple sclerosis (MS) with difficulty concentrating, writing and keyboarding. Included with her claim was an attending physician statement completed by Dr. Paul Elliott (neurology) on 8/9/02 indicating a primary diagnosis of MS and secondary diagnoses of cervical herniated nucleus pulposis, hypertension, fibromyalgia with symptoms of chronic pain, blurred vision, depression and intermittent confusion. Dr. Elliott indicated that MRI's of the brain in December 2001 and May 2002 showed demyelinating disease. He indicated physical restrictions of unlimited sitting, 2 hours of standing and walking with a 15 minute break, 10 pounds of lifting and pushing, and no repetitive hand motion. He indicated that Ms. Richards had occasional blurred vision, but that she could drive when her vision was alright.

Included were results of imaging studies and Ms. Richards' initial evaluation by Dr. Elliott on 7/15/01. Dr. Elliott noted that Ms. Richards reported a motor vehicle accident in December 1995 which resulted in cervical fusion surgery in 1998 followed by continuing pain predominantly on the right side, but also affecting the left side more recently. She reported additional accidental falls in 1999 and 2001. She reported headaches for which she had seen multiple physicians. She reported undergoing an MRI of the brain in 2000 which showed some white matter lesions. While a diagnosis of MS was considered, it was felt after multiple work-ups that her reported neurological symptoms were related to her cervical spine and not MS. She reported only short-lived relief from her fusion surgery at C4-5, after which she experienced ongoing and progressive symptoms. She indicated that she was told she had protruding discs. She also reported undergoing a prior work-up for lupus in the 1980's. She indicated that her

current primary physician was Dr. Wubbenga. Dr. Elliott, however, performed a neurological examination which was unremarkable. His diagnoses included somatization disorder, fibromyalgia and cervical disc disease status post fusion at C4-5.

MRI of the cervical spine on 5/17/02 showed prior fusion with hardware at C4-5 with moderate disc herniation at C5-6 more prominent on the left with no evidence of cord impingement, and mild disc herniation at C6-7 without significant mass effect. Prior CT scan of the cervical spine in November 2001 showed a good osseous union occurring at the site of Ms. Richards' C4-5 fusion surgery with normal post-operative alignment, moderate secondary degeneration and narrowing of the C3-4, C5-6 and C6-7 disc spaces, probable small disc herniation at C5-6, with no other significant findings otherwise noted. MRI of the brain on 12/6/01 showed significant posterior pariventricular signal changes significantly greater than expected for a patient of this age with minimal subcortical foci of increased signal. The report noted that demyelinating disease needed to be considered although early small vessel disease or vasculitis could also give a similar appearance.

We received a consultation summary from Dr. Mitchell Untracht (pain specialist) dated 8/12/02 for evaluation of bilateral neck and arm pain, and headache dating back to July 1999. Physical examination showed a somewhat reduced extension of the cervical spine with normal flexion but somewhat reduced lateral rotation. Neurological findings were unremarkable. Dr. Untracht concluded that Ms. Richards was suffering from cervicogenic headache and radiculitis due to ongoing cervical disc disease. Recommendation was for epidural steroid injections.

On 10/4/02 and 10/21/02 Ms. Richards was evaluated for symptoms of possible MS by Dr. Steingo, who noted that her white matter changes on MRI were not typical for MS. He noted that Ms. Richards had recently undergone visual evoked potential study and auditory evoked potential study which were normal. He noted that Dr. Galvez-Jiminez did not feel there was any evidence of MS or vasculitis, and that Ms. Richards' white matter changes were probably related to her age. Based on his examination and lab results, Dr. Steingo concluded that the findings were not classical for MS and that Ms. Richards' complaints of pain could be due to her cervical spondylosis. He concluded that he could not make a diagnosis of MS with the non-specific MRI findings and negative ancillary studies. He also noted that Ms. Richards was found to have positive cardiolipin antibodies with a recommendation for follow up with a rheumatologist to determine if this was significant. He noted that antiphospholipid syndrome could mimic MS.

On a physical capacities form dated 11/4/02, Dr. Elliott indicated that Ms. Richards could sit, stand and walk 2 hours; occasionally lift up to 50 pounds; frequently balance, reach at or below waist level, and handle, finger and feel; occasionally climb, stoop, kneel, and crouch, but was restricted from reaching above shoulder level or repetitive use of the hands and feet. He indicated that Ms. Richards had chronic pain, depression and

intermittent confusion, with diagnoses of cervical herniated nucleus pulposis, radiculopathy, hypertension and fibromyalgia.

We received updated records from Dr. Elliott. On 10/22/02 Ms. Richards underwent an MRI of the lumbar spine which showed mild degenerative changes at L4-5 with intraforaminal disc herniation and no enhancing masses. On 12/2/02 Dr. Elliott noted that Ms. Richards was doing well on Lexipro prescribed by Pat Brown, NP, but reported lumbosacral pain despite undergoing epidural steroid injections. On 10/28/02 he indicated that a lumbar puncture and MS panel were negative. On 12/2/02 he noted Ms. Richards was doing well, and an additional diagnosis of conversion disorder was made.

On a 1/2/03 questionnaire, Ms. Richards indicated that the discs in her lower back and neck as well as her arthritis had worsened; she had been diagnosed with antiphospholipid syndrome; and her MS symptoms were still active with worsened pain. Accompanying the questionnaire was a letter describing in detail the physical and emotional impact of her condition on her daily life.

On 12/30/02 Dr. Elliott completed an updated attending physician statement indicating a continuing primary diagnosis of MS and secondary diagnoses of cervical herniated nucleus pulposis, cervical radiculpathy, hypertension and fibromyalgia with symptoms of chronic pain, blurred vision, intermittent confusion and depression. Dr. Elliott provided physical restrictions consistent with those contained in his previous attending physician statements, noting that Ms. Richards had bouts of blurred vision and eye pain. Included were updated office visit notes from 1/20/03 indicating complaints of left arm pain and an episode of lost sight in the left eye.

On 2/5/03 Ms. Richards provided documentation of her physical activities and self-reported restrictions from 1/24/03 to 2/2/03. She indicated that she had seen neuropsychologist Pat Brown, who increased her Lexipro for treatment of her depression.

We received a copy of a Social Security questionnaire completed by Ms. Richards on 2/17/03 indicating that she was forgetful, heat-sensitive, unable to dress or undress herself on bad days, and unable to finish tasks. Included was a second letter detailing her activities of daily living.

We received a behavioral functional evaluation form completed on 2/19/03 by Gilda Broadwell, Ph.D. Ms. Broadwell indicated that Ms. Richards was currently treated with Ultram and Soma prescribed by Dr. Elliott, and Lexipro prescribed Dr. Brown. She indicated that Ms. Richards' symptoms included tearfulness, hopelessness, suicidal ideation without plan, and excessive worrying. Her clinical presentation was characterized as hyperverbal and circumstantial with depressed mood and flat affect. Treatment plan was for therapy focusing on chronic pain. Included were group therapy records for the period 11/25/02 to 2/12/03.

On 2/26/03 our nurse practitioner spoke by telephone with Ms. Broadwell, who indicated that your present level of depression did not limit you from working.

On 2/26/03 we wrote a letter denying Ms. Richards' claim. The letter concluded that based on the functional information provided by her and her care providers, she was able to return to her regular occupation.

Subsequent to our 2/26/03 letter we received your letter of appeal on behalf of Ms. Richards which argued that our letter did not contain an analysis supporting our decision to deny LTD benefits. Your letter argued that Ms. Richards' file contained extensive objective evidence supporting her disability. The letter argued that her ability to perform some household activities did not mean that she was capable of performing her occupation on a full-time basis.

Included were the results of a 6/2/03 neurological examination which was normal except for a mild ataxia. A diagnosis of possible MS was again made as well as anxiety and depression, cervical disc herniation, and antiphospholipid antibody.

Also included was a letter from Dr. Elliott dated 6/16/03 indicating that he had treated Ms. Richards for the last 2 years for tentative diagnoses of possible MS, cervical herniated nucleus pulposis, antiphospholipid antibody syndrome, and anxiety and depression. He wrote that Ms. Richards suffers from chronic pain and has limited work abilities compounded by stress from her husband's ailments and recent cardiac condition. He noted that Ms. Richards was seen on 6/2/03 with complaints of pain and having difficulty ambulating. He indicated that she was under pain management with Dr. Untracht and was being treated with duragesic patch. Her recent complaints included paresthesias and burning of the soles of her feet, neck pain, diminished range of motion, right-sided body pain and blurred vision for which she was under the care of Dr. Kadingo. Dr. Elliot noted that Ms. Richards was recently hospitalized for possible suicide attempt and that she was under the additional care of Dr. Pat Brown who had placed her on medications for anxiety and depression. He concluded that she was unable to work in a full-time capacity.

As part of our appeal review, we obtained opthalmologic records from Dr. Kadingo, and records of Ms. Richards' hospitalization at Savannas Hospital. The records showed that she was hospitalized from 5/2/03 to 5/8/03 following an overdose of medication after an argument with her husband. She indicated that she had been under a lot of stress and had acted impulsively trying to get attention from her husband. She cited that she was recently diagnosed with MS and had a history of herniated disc and low back arthritis following cervical fusion. She indicated that she had chronic neck and back pain, was treated by Dr. Pat Brown for depression, and was attending a chronic pain group. On discharge her mental status exam was noted to be essentially normal with normal cognition, affect, thought content and thought processes. Her diagnosis on discharge was

3)  Pain Syndrome – Ms. Richards has a widespread pain syndrome, however her subjective symptoms exceed the objective findings in file. He complaint of right-sided pain greater left-sided pain is inconsistent with the findings on her cervical and lumbar MRI's which show left-sided findings. While some degree of pain in the lumbar and cervical regions would be expected based on the MRI findings, the degree of pain reported exceeds the objective findings. Dr. Mercer noted that dr. Elliott raised the possibilities of somatization disorder or conversion disorder as possible explanations for Ms. Richards' reported symptoms.

4)  MS – A diagnosis of possible MS has been raised by Dr. Elliott. However the medical record does not provide objective information to substantiate the diagnosis based on frequently normal examinations despite multiple neurological complaints. The only abnormalities noted on neurological examination were slight difficulty with tandem gait on 10/4/02 and mild ataxia on 6/2/03. The etiology of the mild ataxia is uncertain and may be related to new medications instituted in May 2003 at the time of her suicide attempt. Clear evidence of an MS exacerbation is not included in the medical record. The findings on her brain MRI were ultimately felt to be age-related. There was no evidence of gadolinium enhancement consistent with disease activity which would correlate to her symptoms. White matter changes consistent with MS were not present. Ms. Richards' visual and brainstem visual and brainstem auditory evoked potentials were all normal despite her report of frequent visual symptoms, and there is no evidence of optic neuropathy. Her spinal fluid exam was benign with no evidence of MS. Dr. Mercer concurred with the assessments of the Mayo Clinic, Cleveland Clinic and Dr. Steingo at the MS clinic that the medical records do not substantiate a diagnosis of MS.

5)  Visual Symptoms and Eye Pain – Dr. Mercer noted that headache pain radiating to the retroocular area can be a symptom of cervical spondylosis, and this could be the cause of the eye pain reported by Ms. Richards. Generally, this does not preclude sedentary-level activity. Repeated opthalmological evaluations did not show a cause for the reported eye pain. Ms. Richards' visual acuity was repeatedly 20/20 or 20/25 with intact visual fields. There is no evidence of visual impairment. While there is lattice degeneration in the retina, there is no evidence that this has resulted in any visual field impairment or other functional compromise. Dr. Kadingo agreed with this assessment in his teleconference with Dr. Mercer, indicating that he did not see any objective evidence to support any impairment from a visual perspective or the need for any visual restrictions.

6)  Antiphospholipid Antibody Syndrome – Dr. Mercer agreed that this was a possible diagnosis for Ms. Richards based on a single test result consistent with the diagnosis. He indicated that individuals with this syndrome may have transient episodes of visual obscuration lasting 5 minutes or less. Therefore when Ms. Richards did

experience visual graying – assuming the diagnosis of antiphospholipid antibody syndrome could be confirmed by follow up studies – it would be reasonable to allow her to rest for one to five minutes as necessary for the visual graying to pass.

Based on his review of the file and discussions with Dr. Elliott and Dr. Kadingo, Dr. Mercer concluded that there was no objective information in the medical record that would preclude Ms. Richards from functioning on a full-time sedentary basis with restrictions of having the ability to change position on an hourly basis, not working at unprotected heights and on ladders, and having the opportunity to rest for one to five minutes during episodes of monocular visual obscuration. He indicated that there were no limitations on frequent keyboarding or other visual limitations at performing fine detail work. He noted that the restriction of resting for up to 5 minutes during visual obscuration assumes that the diagnosis of antiphospholipid antibody syndrome is confirmed. He noted that Ms. Richards' reports of frequent visual blurring is not supported by multiple ophthalmologic evaluations documenting 20/20 or 20/25 visual acuity at every visit, and that the frequency of visual obscuration with antiphospholipid antibody would be anticipated to be relatively limited.

The information received supports Ms. Richards' functional capacity for full-time sedentary work activities with the restrictions outlined by Dr. Mercer. There is no indication that Ms. Richards is functionally impaired from frequent keyboarding or fine visual work. Both Dr. Elliott and Dr. Kadingo have expressed agreement with this assessment in teleconferences with Dr. Mercer. In addition, although Ms. Richards was hospitalized in May 2003 following a suicide attempt, her therapist has indicated that she was not impaired from a psychological standpoint as of the approximate date LTD benefits were due to become effective in January 2003.

Ms. Richards' occupation of Title Examiner, as defined in the national economy, requires a sedentary level of exertion. Her doctors have indicated that she is not impaired from sedentary-level work. Dr. Mercer has documented restrictions which do not preclude her from performing the duties of her occupation. Accordingly, the decision to deny her claim is appropriate and must be upheld.

Please be advised that we are closing our file at this time and will take no further action with regard to Ms. Richards' claim.

As her attorney, you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to her claim. You may bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA").

Sincerely,

David J. Cohen, BMS Appeal Specialist
Hartford Life and Accident Insurance Company

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

MAGISTRATE JUDGE

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974 is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

ROSEMARY R. RICHARDS

**03-8106**

**DEFENDANTS- RYSKAMP**

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, and FIDELITY NATIONAL FINANCIAL, INC.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Palm Beach
(EXCEPT IN U.S. PLAINTIFF CASES)

0:03CV81066 KLR/AEV

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Palm Beach
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME ADDRESS AND TELEPHONE NUMBER)

Stewart Lee Karlin, P.A., 315 S.E. 7 Street, 2ⁿᵈ Floor
Fort Lauderdale, Florida 33301, (954) 462-1201

ATTORNEYS (IF KNOWN)

UNKNOWN

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury Med. Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | **PERSONAL PROPERTY** | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | B☐ 690 Other | **B SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **A LABOR** | ☐ 861 HIA 1395ff | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | B☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | A OR B |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

29 U.S.C. 1001 ERISA — Suit for disability policy — denied benefits

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $** Unr policy

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

None

JUDGE _____  DOCKET NUMBER _____

DATE  11-20-03

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 5298B  AMOUNT 150 00  APPLYING IFP ___  JUDGE ___  MAG. JUDGE ___